UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| **Ashley Edwards,**<br><br>*Plaintiff*,<br><br>v.<br><br>**Consumer Adjustment Company, Inc., AND Experian Information Solutions, Inc.,**<br><br>*Defendants*. | Case Number:<br><br>Ad Damnum: **$14,000 + Punitive Damages + Atty Fees & Costs**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, **Ashley Edwards** ("**Ms. Edwards**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Consumer Adjustment Company, Inc.** ("**Consumer Adjustment**"), and **Experian Information Solutions, Inc**. ("**Experian**") (jointly, the "**Defendants**"), stating as follows:

**PRELIMINARY STATEMENT**

1. This is an action brought by Ms. Edwards against Consumer Adjustment for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et seq.* ("**FDCPA**"), and the *Florida Consumer Collection Practices Act*, Section 559.55, Florida Statutes, *et seq.* ("**FCCPA**"), and against Experian for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2. Subject matter jurisdiction arises under the FDCPA, 15 U.S.C. § 1692k(d), the FCRA, 15 U.S.C. § 1681p, the FCCPA, Section 559.77, Florida Statutes, and 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction for Ms. Edwards' state law claims pursuant to 28 U.S.C. § 1367.

4. Consumer Adjustment is subject to the FDCPA and the FCCPA, Experian is subject to the FCRA, and the Defendants are subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

5. Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred within this District.

## PARTIES

### Ms. Edwards

6. **Ms. Edwards** is a natural person residing in the community of Wimauma, Hillsborough County, Florida, and a *Consumer* as defined by the FDCPA, 15 U.S.C. §1692a(3), the FCCPA, Section 559.55(8), Florida Statutes, and the FCRA, 15 U.S.C. §1681a(c).

### Consumer Adjustment

7. **Consumer Adjustment** is a Missouri corporation with a primary business address of **12855 Tesson Ferry Rd., Saint Louis, MO 63128**.

8. Consumer Adjustment is registered to conduct business in the State of Florida as a foreign corporation, where its Registered Agent is **Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.**

9. Consumer Adjustment is a *Debt Collector* within the meaning of the FDCPA and the FCCPA, 15 U.S.C. § 1692a(6) and Section 559.55(7), Florida Statutes, respectively, in that it uses e-mail, an instrumentality of commerce, interstate and within the State of Florida, for its business, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

10. Consumer Adjustment is registered with the Florida Office of Financial Regulation as a *Consumer Collection Agency* ("**CCA**"), holding license number **CCA9904365**. **SEE PLAINTIFF'S EXHIBIT A.**

11. As a licensed CCA, Consumer Adjustment knows or should know the requirements of both the FDCPA and the FCCPA.

### Experian

12. **Experian** is an Ohio corporation with a primary business address of **475 Anton Blvd., Costa Mesa, CA 92626.**

13. Experian is registered to conduct business in the State of Florida as a foreign corporation, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.**

14. Experian is a nationwide *Consumer Credit Reporting Agency* ("**CRA**") within the meaning of 15 U.S.C. § 1681a(f), in that, for monetary fees, it regularly engages in the practice of assembling or evaluating consumer credit information on consumers for the purpose of furnishing consumer reports to third parties, while using means of interstate commerce, specifically the mail and internet, for the purpose of preparing or furnishing consumer reports.

15. As a CRA, Experian is aware of its obligations under the FCRA.

## FACTUAL ALLEGATIONS

### Midwest Recovery 'Parks' 9 Bogus Debts on Ms. Edwards' Credit Reports

16. Midwest Recovery Systems ("**Midwest Recovery**") was a debt collection agency based in St. Louis that had a long, checkered history of collecting purported consumer debts through questionable means.

17. Midwest Recovery was a furnisher of information to the three largest, nationwide CRAs: Experian, Equifax Information Services, LLC ("**Equifax**"), and Trans Union LLC ("**Trans Union**").

18. For years, Midwest Recovery engaged in what the Federal Trade Commission ("**FTC**") referred to as "**debt parking**." Debt parking, also known as "passive debt collection," occurs when a debt collector like Midwest Recovery reports false or questionable debts about a consumer, causing the collection balance to appear on the consumer's credit report. The consumer is not first contacted by the debt

collector; the debt simply appears on the consumer's credit history without notice being mailed to the consumer with FDCPA-mandated disclosures, such as notice that the debt collector is involved in the collection of a debt, the amount of the debt alleged, the right to dispute the debt, and more.

19. The debts often go unnoticed until a consumer applies for a loan or employment, at which point the consumer tends to hastily pay off the debt rather than attempt to dispute the debt's authenticity in order to prevent it from further interfering with important transactions.

20. Most of the debts reported in this way by Midwest Recovery were of questionable, or even illegal, provenance. Midwest Recovery reported a considerable number of debts concerning Florida consumers that were owed to various online payday lenders like Sky Trail Cash, a lender who made loans to Florida consumers at interest rates higher than 800%. Such loans are categorically illegal, unenforceable, null and void in Florida. *See* Section 687.071, Florida Statutes.

21. The FTC also alleged that Midwest Recovery collected at least 24,000 payday loan debts supposedly originated by companies owned by Joel Tucker, who was notorious in the debt collection industry for making non-existent "phantom" loans to consumers, then calling the consumers and demanding payment, threatening legal action if the purported debt was not paid.

22. Midwest Recovery also reported a large number of old, charged-off credit card debts and medical debts supposedly owed by consumers.

23. Most of the debts reported by Midwest Recovery were "debt portfolios" purchased in bulk by debt purchasing companies controlled by Brandon Tumber ("**Tumber**"), who was also, simultaneously, the CEO of Midwest Recovery.

24. These bulk debt portfolios can be bought, sold, and traded through any number of debt brokers and online platforms. The portfolios are little more than Microsoft Excel spreadsheets that contain consumers' names, last known address, other personally identifying information, supposed account balance and name of the creditor(s) to whom the debt was originally owed.

25. No central registry of debt ownership exists, nor does any mechanism exist to track which debts are legitimate, which have been paid, which have been disputed, which were never owed, and so forth. Further, as these portfolios are simple electronic files, they can be copied easily.

26. Jake Halpern, a *New York Times* investigative journalist, spent more than a year researching the industry, observing first-hand that these often unencrypted spreadsheets containing millions of dollars of supposed consumer debt could be copied onto a USB thumb drive and surreptitiously walked out of the debt collector's office by an employee paid by another debt collector to obtain new debt portfolios. The debts in the portfolio would then be collected by multiple debt collectors, each one of which claimed to be the rightful "owner" of the debt. Jake Halpern, *Paper Boys: Inside the Dark, Labyrinthine, and Extremely Lucrative World of Consumer Debt Collection*, The New York Times Magazine, August 15, 2014.

27. Midwest Recovery frequently ran afoul of state regulators. As but one example, a cease-and-desist order was entered against it in 2018 by the Idaho Department of Finance requiring it to immediately stop violating the Idaho Collection Agency Act, §26-2221, *et seq*.

28. Eventually, Midwest Recovery's actions attracted the attention of federal authorities, including the FTC.

29. When a consumer disputes the accuracy of a reported account to Equifax, Experian or Trans Union, the CRA is required by the FCRA to make an investigation into the consumer's dispute. In virtually all instances, this is done through a platform jointly developed by Equifax, Experian and Trans Union called e-OSCAR, which sends an ***Automated Consumer Dispute Verification Request*** ("**ACDV**") to the relevant data furnisher with a description of the dispute. The data furnisher is then required to investigate the dispute and respond to the ACDV by either confirming the accuracy, confirming the accuracy with modifications, or stating the accuracy cannot be confirmed, which results in the CRA deleting the information from the consumer's credit file.

30. The FTC noted a high volume of consumer complaints against Midwest Recovery. The FTC also found in its investigation that while a typical debt collector responds to about 8% of ACDVs indicating accuracy cannot be verified and thus the tradeline should be deleted, Midwest "regularly concluded that 80-97% of disputed debts are either inaccurate or invalid." *Federal Trade Commission vs. Midwest Recovery Systems LLC*, et. al, case 4:20-cv-01674, U.S.D.C., E.D. Mo., November 25, 2020.

31. The FTC also learned in its investigation that at least one of the three major CRAs had grown concerned about Midwest Recovery's "submitting a significant amount of delete responses per month" which, the CRA noted, raised issues regarding the "integrity of the data." *Id.*

32. In September 2019, Tumber, Kenny Conway and Joseph Smith, the co-owners of Midwest Recovery, sold the company to Consumer Adjustment. In addition to cash, Tumber received an ownership stake in Consumer Adjustment.

33. In April 2020, Midwest Recovery – at this point owned by Consumer Adjustment – reported **nine** collection accounts to Experian and Equifax concerning Ms. Edwards. All nine of the collections were medical debts supposedly owed to St. Joseph's Hospital. All of the nine "debts" were supposedly incurred on the same day – April 13, 2016. Six of the nine debts were for the same amount – $71. The remaining purported debts were for $177, $102, and $34. **SEE PLAINTIFF'S EXHIBIT B.**

34. Midwest Recovery reported a "date opened" of March 2020. *Id.*

35. Pursuant to Metro 2 standards promulgated by the *Credit Reporting Resource Guide*, a debt collector is instructed to report the date it receives a debt for collection in the "date opened" field.

36. St. Joseph's Hospital bills for its services in aggregate. All charges related to a specific emergency room visit would appear on a single composite bill, which would contain the cumulative total charges billed by St. Joseph's Hospital.

37. If a patient was treated, released, but then had further complications which required a second trip in the same day, St. Joseph's Hospital would create a separate invoice for the second visit.

38. However, it would be incredibly unlikely any consumer would be treated and released *nine separate times* on a single day, which is exactly what Consumer Adjustment reported had occurred on April 13, 2016. Presumably, any competent medical professional, upon seeing the same patient treated and released but returning for even a third time in a single day, would admit the patient to the hospital for further treatment or observation.

39. Thus, either Ms. Edwards was somehow treated and released nine times on a single day at the same hospital, each time incurring bills under $180 – with six out of nine visits incurring the same $71 amount – *or* a debt collector who purchased purported debts from questionable sources, sometimes fabricating them outright, and then collected millions from parking them on consumers' credit reports simply invented nine debts Ms. Edwards was alleged to owe, not bothering to even stagger the date of original delinquency between the nine debts.

40. Around August 7, 2020, Ms. Edwards disputed the nine Midwest Recovery tradelines to Experian, stating that she had no knowledge of the reported debts.

41. Experian then sent Midwest Recovery nine ACDVs through e-OSCAR.

42. A short time later, Midwest Recovery responded that zero of the nine accounts could be verified as accurate; as a result, Experian deleted all nine accounts from Ms. Edwards' credit file.

43. By August 2020, Tumber and Midwest Recovery were aware of the FTC's investigation of its debt parking and collection practices.

44. Tumber and Midwest Recovery had few choices but to settle with the FTC and would soon sign a stipulated order for permanent injunction and monetary judgment, in which they would be required by the FTC to cease parking debts on consumer credit reports, not engage in any unlawful debt collection practices, and stop collecting debts which could not be reasonably verified. Tumber and Midwest Recovery would have to request deletion of all the tradelines they had reported and parked on consumers' credit reports. Further, Tumber, personally, was required to turn over virtually all of the money he had in his possession, roughly $56,748. The FTC "took every dollar I had to my name" Tumber later told the *St. Louis Post-Dispatch*, adding that the allegations against him were "totally false."

45. Tumber was required by the FTC to divest his interest in Consumer Adjustment as well. On October 3, 2020, Tumber signed the FTC's stipulation, agreeing to the aforementioned terms and monetary penalty of $24.3 million.

46. Tumber apparently had no intention of complying with the FTC's demands and only made it appear as though he had done so.

47. In September 2020 – shortly before signing the stipulation with the FTC – Tumber and Consumer Adjustment took hundreds of thousands of debts previously

parked by Midwest Recovery and re-reported them to the CRAs under Consumer Adjustment's name, in essence "re-parking" them.

48. Included in this trove were the nine bogus medical debts supposedly incurred by Ms. Edwards on April 13, 2016. Despite having been deleted in August 2020, the identical nine debts were re-reported and re-inserted into Ms. Edwards' Experian credit file in September 2020.

49. Consumer Adjustment, despite prior knowledge that the debts were disputed (*vis-à-vis* the e-OSCAR disputes received by its subsidiary, Midwest Recovery) failed to report the debts as "disputed by consumer" in its reporting to Experian.

50. The Consumer Adjustment iterations of the nine bogus medical debt tradelines did not indicate the accounts had been transferred to Consumer Adjustment from Midwest Recovery, but instead indicated they were continuations of the reporting initiated by Midwest Recovery. The "date opened" on all nine tradelines reflected the same "March 2020" dates, meaning Consumer Adjustment was reporting to Experian it had received the debts for collection in March 2020; Midwest Recovery had reported it had also received the debts for collection in March 2020.

51. The FCRA at § 1681i(a)(5)(C) requires a CRA like Experian to maintain reasonable procedures to prevent the reappearance of information which has been disputed and deleted.

52. If previously deleted information is reinserted into a consumer's credit file, the FCRA at § 1681i(a)(5)(B)(i) requires the CRA to obtain certification of accuracy and must, within five days of obtaining such certification, send written notice

to the consumer advising her of the previously deleted information being reinserted. *See* § 1681i(a)(5)(B)(ii).

53. Experian obtained no such certification of accuracy, nor could it – Ms. Edwards did not incur nine different medical debts to St. Joseph's Hospital on the same day. Experian did not mail Ms. Edwards any written notice advising her of the previously deleted information being reinserted into her file.

54. Any set of reasonable procedures would have quickly spotted that nine debts from April 13, 2016 – six for $71, and one each of $177, $102, and $34 – all showing St. Joseph's Hospital as the original creditor which were disputed and deleted, then re-reported the next month by Consumer Adjustment, which owned the entity previously reporting the identical nine accounts, were clearly duplicates of the just-deleted tradelines. As obvious as this was, Experian had additional hints to help it determine the accounts were duplicates, including the fact that the Consumer Adjustment iterations of the tradelines indicated they had been placed for collection in March 2020, the same date the Midwest Recovery iterations indicated.

55. Beyond this, Midwest Recovery's legal troubles with the FTC regarding debt parking was covered widely in the national news media, including the *New York Times*, FOX News, CNN, Reuters, the Associated Press, and hundreds of other media outlets.

56. As flagrant and obvious as Tumber's hide-the-shell routine was – swapping out the name of Midwest Recovery for Consumer Adjustment and then re-parking debts under this new name, despite having promised to a federal agency to

request deletion of the tradelines, permanently – Experian accepted the reports without question and incorporated them into Ms. Edwards' credit file.

57. Experian sold reports concerning Ms. Edwards to Suncoast Schools Federal Credit Union on October 27, 2020, and November 24, 2020, containing the nine false and illegally reinserted tradelines; likely, Experian sold other reports concerning Ms. Edwards with the nine Consumer Adjustment tradelines as well.

58. No reasonable procedures designed to ensure maximum possible accuracy of the reports sold concerning Ms. Edwards were utilized by Experian when producing the aforementioned reports, since no reasonable procedure would encompass the inclusion of disputed, deleted, and then re-inserted information from an agency like Consumer Adjustment – especially without the legally required verification of accuracy mandated by the FCRA.

59. Reporting a debt to a CRA is a communication in connection with the collection of a debt and a *per se* attempt to collect the debt alleged therein.

60. Consumer Adjustment never mailed Ms. Edwards notice of her rights pursuant to 15 U.S.C. § 1692g, nor did it communicate with her that it was attempting to collect the debts from her that it had parked on her credit reports.

61. Consumer Adjustment's reports to Experian concerning Ms. Edwards were *Communications* as defined by 15 U.S.C. § 1692a(2) and Section 559.55(2), Florida Statutes.

62. Ms. Edwards has suffered lost financial opportunities, significant emotional distress and aggravation as a result of the Defendants' cavalier actions and failures.

63. Ms. Edwards has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FDCPA – *Consumer Adjustment*

64. Ms. Edwards incorporates paragraphs 1 – 63 as if fully restated herein.

65. Consumer Adjustment violated **15 U.S.C. § 1692e(2)(a)** when it made false representations regarding the character or legal status of a debt by falsely representing to Ms. Edwards, to the CRAs, and to readers of Ms. Edwards' credit reports that the nine debts supposedly owed to St. Joseph's Hospital were not disputed by her, were actually owed, and, more importantly, actually existed and were legitimate. Beyond this, Consumer Adjustment was aware that one of its owners, Tumber, had expressly agreed to request deletion of these very same tradelines in his and Midwest Recovery's settlement with the FTC. Consumer Adjustment knew or should have known that it was reporting and re-parking debts under its name, a continuation of the identical practices which led to the FTC's $24.3 million stipulated judgment against Tumber and Midwest Recovery.

66. Consumer Adjustment violated **15 U.S.C. § 1692e(8)** when it communicated credit information known to be false by reporting to the CRAs that Ms. Edwards owed nine debts to St. Joseph's Hospital.

67. Consumer Adjustment violated **15 U.S.C. § 1692e(8)** when it communicated credit information known to be disputed without disclosure of dispute by reporting to the CRAs that Ms. Edwards owed the nine St. Joseph's Hospital debts and failing to disclose in its reports that the debts were "disputed by consumer," even though it had received prior notice of dispute from Ms. Edwards.

68. Consumer Adjustment violated **15 U.S.C. § 1692e and 1692e(10)** when it used false, deceptive, and misleading representations in connection with the collection of a debt by reporting – and parking – nine non-existent debts to the CRAs without disclosure that the debts were disputed. Beyond this, Consumer Adjustment was aware that one of its owners, Tumber, had expressly agreed to request deletion of these very same tradelines in his and Midwest Recovery's settlement with the FTC. Consumer Adjustment knew or should have known that it was reporting and re-parking debts under its name, a continuation of the identical practices which led to the FTC's $24.3 million stipulated judgment against Tumber and Midwest Recovery, and that such practices were illegal and in contravention to the FDCPA.

69. Consumer Adjustment violated **15 U.S.C. § 1692f** when it intentionally reported nine bogus debts to Experian, under its own name, despite knowing the debts had been previously reported by Midwest Recovery, disputed and deleted, and that "debt parking" was in contravention to the FDCPA, as plainly obvious by the FTC's multi-million-dollar stipulated judgment against its subsidiary, Midwest Recovery.

70. Consumer Adjustment's actions were willful and intentional and representative of their normal business practices.

**WHEREFORE**, Ms. Edwards respectfully requests this Honorable Court to enter judgment against Consumer Adjustment, and for her, for:

a. Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b. Actual damages pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d. Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE FCCPA – *Consumer Adjustment*

71. Ms. Edwards incorporates paragraphs 1 – 63 as if fully restated herein.

72. Consumer Adjustment violated **Section 559.72(6), Florida Statutes**, when it communicated credit information known to be disputed without disclosure of dispute, in its reports to Experian, and it made such reports willfully and with malice, to harm Ms. Edwards' ability to obtain new credit.

73. Consumer Adjustment violated **Section 559.72(9), Florida Statutes**, when it attempted to enforce debts against Ms. Edwards which it knew or should have known were not legitimate.

74. Consumer Adjustment's actions were willful, intentional, done with malice, and done with the intention of circumventing a legally binding agreement with the FTC to not report these very same debts.

75. "Malice can be established by evidence showing the defendant made a false statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Long v. Pendrick Capital Partners II, LLC*, Case No.: GJH-17-1955 (D. Md. Mar. 18, 2019) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270-80 (1964) ("A jury could conclude that (Defendant) acted with reckless disregard for the truth when it initially furnished data about the disputed Emcare debt to the CRAs and when it verified the debt more than once. Plaintiff put (Defendant) on notice that she was not responsible for the Emcare debt, yet (Defendant) reported the debt anyway.")

76. By its conduct, Consumer Adjustment is liable for the above-stated violations of the FCCPA.

**WHEREFORE,** Ms. Edwards respectfully requests this Honorable Court enter judgment against Consumer Adjustment, and for her, for:

a. Statutory damages of **$1,000.00** pursuant to Section 559.77(2), Florida Statutes;

b. Actual damages pursuant to Section 559.77(2), Florida Statutes;

c. Punitive damages for its intentional, illegal debt collection efforts, pursuant to Section 559.77(2), Florida Statutes;

d. Injunctive relief preventing the Defendants from attempting to collect the alleged debt from Ms. Edwards, pursuant to Section 559.77(2), Florida Statutes;

e. Reasonable costs and attorneys' fees pursuant to Section 559.77(2), Florida Statutes; and,

  f.  Such other relief that this Court deems just and proper.

## COUNT III
## VIOLATIONS OF THE FCRA – *Experian*

77. Ms. Edwards incorporates paragraphs 1 – 63 as if fully stated herein.

78. Experian violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure maximum possible accuracy by including false and inaccurate information in Ms. Edwards' credit reports, on at least two occasions, when it compiled and produced reports indicating Ms. Edwards owed nine medical debts to St. Joseph's Hospital which were all – somehow – incurred on the same day. The debts had been disputed and deleted from Ms. Edwards' credit file in August, only to be re-inserted without the legally required certification of accuracy and written notice to Ms. Edwards, and had been reported by the parent company of a debt collector whose illegal activities and run-ins with the FTC had been extensively covered in the news media. Experian had no basis to believe the information was accurate when the debts were "re-parked" by Consumer Adjustment in September 2020 and then re-reported monthly after that.

79. Experian violated **15 U.S.C. § 1681i(a)(5)(B)(i)** when it failed to obtain certification of accuracy of previously deleted information and nonetheless reinserted this information into Ms. Edwards' credit file on nine separate occasions.

80. Experian violated **15 U.S.C. § 1681i(a)(5)(B)(ii)** when it failed to provide written notice that it was reinserting previously deleted information into Ms. Edwards' credit file, to wit, the nine St. Joseph's Hospital debts all occurring on the same day.

81. Experian violated **15 U.S.C. § 1681i(a)(5)(B)(iii)(I)** when it failed to provide a written statement that it was reinserting disputed information into Ms. Edwards' credit file, to wit, the nine St. Joseph's Hospital debts all occurring on the same day.

82. Experian violated **15 U.S.C. § 1681i(a)(5)(B)(iii)(II)** when it failed to provide the business name and address of the entity associated with the reinsertion of the previously deleted information.

83. Experian violated **15 U.S.C. § 1681i(a)(5)(B)(iii)(III)** when it failed to provide written notice that Ms. Edwards had the right to add a statement to her file disputing the accuracy or completeness of the disputed information.

84. Experian's conduct was willful and intentional, or, alternately, was performed with a reckless disregard for its duties under the FCRA to provide reports with maximum possible accuracy.

85. It is reasonably foreseeable that Experian's actions would cause Ms. Edwards harm.

86. As a result of its conduct, Experian is liable to Ms. Edwards pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Edwards respectfully requests this Honorable Court enter judgment against Experian, and for her, for:

    a. The greater of statutory damages of **$1,000** per incident (for a total of **$12,000**), pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. §

        1681o(a)(1) or Ms. Edwards' actual damages for loss of credit opportunities and related economic and non-economic injuries;

b.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3); and,

c.    Such other relief that this Court deems just and proper.

## JURY TRIAL DEMANDED

Ms. Edwards hereby demands a jury trial on all issues so triable.

Respectfully submitted on **February 10, 2021**, by:

**SERAPH LEGAL, P. A.**

*/s/ Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar No.: 1015954
BMorgan@SeraphLegal.Com
*/s/ Thomas M. Bonan*
Thomas M. Bonan, Esq.
Florida Bar No.: 118103
TBonan@SeraphLegal.Com
1614 N 19th Street
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**ATTACHED EXHIBIT LIST**
A    Consumer Adjustment's Florida CCA License
B    Plaintiff's Experian Consumer Disclosure, August 7, 2020, Excerpt